UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 10-10386-PBS |
| | ) | |
| PATRICK LEE, | ) | |
| Defendant. | ) | |

## PATRICK LEE'S SENTENCING MEMORANDUM

Patrick Lee submits this sentencing memorandum to aid the Court in determining a just sentence under the advisory sentencing guidelines. For his part, Mr. Lee stands by his plea agreement with the government to request a sentence of no more than 41 months, 3 years supervised release, and no fine.

**I.      IN DETERMINING AN APPROPRIATE SENTENCE, THE COURT MUST CONSIDER THE §3553 FACTORS WHICH COMPEL THE CONCLUSION THAT THE MECHANCALLY CALCULATED GUIDELINE RANGE IS OVERLY PUNITIVE IN THIS CASE.**

Regardless what the Court concludes regarding the applicable advisory sentencing guideline range in this case, the Court should, after an examination of the factors enumerated in 18 U.S.C. § 3553(a), impose a below-advisory guideline sentence on Lee. In seeking a sentence of 41 months, Mr. Lee notes that the United States Sentencing Guidelines as promulgated by the United States Sentencing Commission do not bind the federal courts. *United States v. Booker*, 543 U.S. 220, 259 (2005). Indeed, as this Court is well aware, the United States Supreme Court's landmark *Booker* decision declared the mandatory provisions of the United States Sentencing Guidelines unconstitutional. *Id. Booker*, however, reaffirmed a sentencing court's duty to sentence a defendant in accordance with those provisions of the Sentencing Reform Act specified in 18 U.S.C. § 3553(a).[1]

---

[1] The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent

Above all, a court's final determination of a sentence must reflect § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)."  See *Kimbrough v. U.S.,*  128 U.S. 558, 575 (2007).

### (a) The History and Characteristics of the Defendant Support a Variance.

A sentence of 41 months is supportable under *U.S. v. Martin,* 520 F.3d 87 (1st Cir. 2008) ("*Martin"*), 18 U.S.C. §3553(a), and as a matter of equity.  For the past decade, *Martin* has been generally cited for the rule that sentencing requires a "case by case approach, the hallmark of which is flexibility" and that a sentencing court should *not* "operate in the belief that substantial variances from the guidelines are always beyond the pale." *U.S. v. Martin,* 520 F.3d at 91 (1st Cir. 2008).   In obvious other words, steep variances from an advisory guidelines sentence are permissible provided there are "sound case-specific reasons for deviating from them."[2] *Id.*

To a certain extent, Mr. Lee and Martin share similar personal characteristics.  Both enjoy significant support from their families and possess personal qualities indicating a good potential for rehabilitation. See *Martin,* 520 F.3d at 89.[3]   *Martin* submitted "letters from family and friends attesting to the defendant's virtues as a father…." *U.S. v. Martin,* 520 F.3d at 93. Mr. Lee similarly submits letters from his wife, two children, mother, father, brother, sister-in-law, mother-in-law, friends, the clergy, his school principal, and community members, all of whom paint a clear picture of a man devoted to his family who suffered a life-changing and catastrophic

---

policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005).

[2]  In *Martin* the court deviated downward a steep 91 months from the advisory guideline sentence. Similarly, Mr. Lee asks this Court to deviate from the government's recommended sentence of the low end of the sentencing guidelines of 63 months to 41 months incarceration. It represents a much lower percentage decrease than *Martin.*

[3]  The obvious dissimilarities between Martin and Lee relate to Martin's extensive criminal history and guilty plea to a charge of conspiracy to distribute more than 35 grams of crack cocaine.  Here, Lee has no prior convictions and the charge against him to which he pled guilty is a white collar crime where there was no violence, no weapons, and no illegal drugs.

event five years ago.[4]  The letters also reveal how uncharacteristic and atypical Mr. Lee's offense behavior was.

Given the similarities bewteen *Martin* and Lee in and of themselves, this Court would be on solid ground in imposing a sentence of 41 months against Mr. Lee.[5]  However, we recognize that many defendants share a common devotion to family and are supported by them in return.  A material distinction with *Martin,* is Mr. Lee's extraordinary family ties and circumstances justifying a below-advisory guideline sentence.  Lydia Lee, Patrick's wife of many years, is disabled and has been since January 2014 when she was involved in a serious car accident.  In a head on collision, she suffered multiple injuries including fractures of her ribs, right femur, and left patella, leaving both her legs largely non-functional. She underwent several surgeries immediately following the accident in which titanium rods, screw, pins and wires were placed in her patella and femur.  Because of extreme blood loss, she had multiple transfusions to prevent her from going into shock. She remained hospitalized for a lengthy stay while she stabilized, recuperated from multiple surgeries and her contusions and abrasions healed. See Exhibit 2 (filed under seal).  Her road to recovery has been long, arduous and uncertain.

The accident happened in Ireland where she, Patrick and their two minor daughters live. She was taken to a local hospital for surgery and post-operative treatment.  Health care in Ireland is not as advanced or extensive as it is in the United States and, as a result, she is permanently disabled and suffers chronic pain.  Her day-to-day functioning is extensively restricted.  Her

---

[4] All of the support letters are attached hereto and incorporated as if fully set forth herein, as Exhibit 1.

[5] Courts other than *Martin have* also considered a *Booker*-based approach to family circumstances enabling judges to draw on a defendant's family circumstances for reasons other than the Congressionally sanctioned purpose of protecting innocent family members from undue harm. For example, in *United States v. Baker*, the Sixth Circuit upheld a variance that gave the defendant five years' probation rather than a sentence within the Guidelines range of 27 to 33 months. The court was persuaded by the district court's emphasis on the defendant's "primary concern" for his children. Judge Siler, in explaining the panel's decision to "focus more on the reasons justifying the variance, rather than the extent" of it, suggested that since *Booker*, sentences may incorporate concern for traditional family values. Likewise, in *United States v. Jones*, the judge granted a downward departure, and issued the lowest possible sentence within that range, with the rationale that the defendant could be with his children as they started high school and thus promote "public safety." Lee fits squarely in this domain.

injuries have impacted other areas of her body as well and she now suffers stiffness in her right hip, limited bending ability, swelling in her upper right thigh, muscle spasms, restriction limiting the range of motion in her left leg, sharp pain in her thighs, memory loss, and depression. Climbing stairs is painful and cumbersome.  Standing on her feet for any sustained length of time causes her legs to swell. She walks with a crutch and has a permanent limp. Sleeping is disrupted because of pain.  Caring for her two children is significantly impacted.   She cannot drive comfortably or for any long distances and taking her children to school and to after school activities are painful.  Her once active lifestyle has been replaced by a forced sedentary one.

Mr. Lee has been the sole caretaker of his wife, children, and the household since the 2014 accident.  He has always been close to his family and shared responsibility along with his wife in raising his two daughters.  Because of the accident, he took over all responsibility for household chores, like grocery shopping, cleaning the house, doing laundry, preparing meals, and the like.  More importantly, he has taken care of Lydia, who was 39 years old at the time of the accident, providing care, comfort and emotional support to her throughout her multiple surgeries, attendant recuperations, and rehabilitation.  He did all the driving whether it was to Lydia's doctor appointments, her physical therapy appointments, or to the childrens' school relieving Lydia of any responsibility.  He bore witness to the steady and slow decline in her condition, watching as her legs swell when she attempted to stand for too long, seeing her encounter difficulty bending or climbing stairs, observing the spreading of pain throughout her body, and helping her through frequent muscle spasms.  Her once steady and confident gait has now been replaced with a noticeable limp.

Because of Lydia's limitations, Mr. Lee took on an even more active involvement in raising his daughters on a day-to-day basis.  He drove them to and from school and to after

school activities.  Assisting them with their homework was a daily event.  He attended to his family willingly, lovingly and without complaint. He did that which was necessary for his family to function as best it could under the new normal.

Since Mr. Lee's extradition in November 2017, no one else has taken over his family responsibilities.  His parents have significant medical problems preventing them from doing as much as he has been doing for his family.  See Exhibit 3. His father suffered several heart attacks and is not capable of the sustained amount of time it takes to care for Lydia and his two granddaughters.  Lydia's mother, likewise, is not well enough to do everything Patrick has done for his family over the last five years. There are no other family members in Ireland to help Lydia in her husband's absence.

Financially, Lydia and her daughters are struggling.  Since the accident and because of her chronic pain, Lydia is incapable of any kind of work whether part-time or working from home.  Before his extradition to the United States, Mr. Lee worked part time to provide financially for his family and devoted the remainder of his time taking care of Lydia.  His limited income provided the sole source of income for the family, the loss of which has been devastating.  Consequently, the bank who held the mortgage on her home sold it to an American investment group and she doesn't know how long they will permit her to remain there, all of which happened while Mr. Lee was extradited to Massachusetts.  In late 2018 she was finally awarded a Disability Allowance from the Social Welfare Office in Dublin.  See Exhibit 5.  It further corroborates her disability.  The standard for Social Welfare benefits is upon a showing that the applicant has "a specified disability" and is "substantially restricted in undertaking suitable employment" for at least one year.  See p. 2 of Exhibit 4.   The Social Welfare Office

relied on medical reports from Lydia's doctor and the hospital where she was treated after the accident and was satisfied that she met the criteria for disability payments. *Id.*

Since Mr. Lee has been in custody in the United States, the separation from Lydia and his children has been unbearable and gut-wrenching. The geographic distance from her has made it painfully impossible to care for her the way he did in Ireland and no other family member has picked up the slack. He has not seen his wife or children since November 2017 when he was taken into custody given Lydia's inability to travel from Ireland to the States.

Detention was justified on grounds that he was a risk of flight. It served to exacerbate his family's decline and pain. Had he not been living outside the United States when he was extradited he most likely would have been released from custody especially given the fact that the government did not request detention on any other grounds. Incarceration for an additional period of time will continue to have deep ramifications on Lydia's well-being. See Exhibit 5. Mr. Lee seeks to return home to Ireland as soon as possible while paying his debt to society for the crimes to which he has taken responsibility, confident that Lydia's steady decline will be slowed by his nurturing, companionship and compassionate care. This Court should rely on Dr. Boland's opinion of the positive effect on Lydia's health once Patrick returns home to Ireland. See Exhibit 6. He succinctly points out that Mr. Lee's absence "is causing further strain and pain for Lydia" and she "has significantly deteriorated medically over the last 12 months (since Lee's detention)." *Id.*

This Court should take into account Lydia's own description of her health since her husband's detention. In her letter dated October 9, 2018, the one year anniversary of Mr. Lee's detention, she described her chronic pain, the deterioration of the muscles in her legs and hips, the limitations on her daily activities, her inability to properly care for her two daughters, her

6

worsening memory loss, and depression.  See Exhibit 5.  She expresses her plight in a day-in-the-life video she made for this Court recently to take into consideration in sentencing her husband.  The video captures her situation far better than this sentencing memorandum and speaks for itself.  It is attached as Exhibit 7.

Compassion and empathy are valid factors in determining a proper sentence for Mr. Lee since it expresses the essence of 18 U.S.C. §3553(a)(1) requiring this Court to take into account the defendant's family ties and circumstances. So too under *Martin,* this Court has a sound basis to sentence Mr. Lee to a term of 41 months incarceration. Such a sentence is sufficient but not greater to accomplish the goals of a just sentence.

### (b)  Mr. Lee Examined Through the Lens of Just Punishment.

When considering what is "just punishment" for purposes of application of § 3553(a)(2), it is important not just to consider the obvious and immediate implications of the incarcerative sentence imposed, but to also consider the broader implications of the sentence. Those who have been convicted and incarcerated face numerous penalties beyond those imposed in the courtroom, including separation from family and financial loss.  One court has commented on the penalties often overlooked when considering what is "just punishment:"

> [T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement. . . . In essence, the court's discretion to depart is a manifestation of the necessity for a just sentencing scheme to include provisions for that reasoned intuitive judgment, rather than a hard, deterministic formula, to govern the rare case. . . . The concept of what is "just punishment" thus contemplates a prospective, empirical assessment, necessarily imprecise, of the accumulation of reasonably foreseeable, ordinary hardships and suffering that any given offender is likely to

7

experience in the typical case during the course of a particular range of imprisonment.")
(citations omitted).

*United States v. Mateo*, 299 F.Supp.2d 201, 209-210 (S.D. N.Y. 2004).

Just punishment as measured on a case-by-case basis just like sentencing as a whole is, compels the conclusion that Mr. Lee's separation from his family over the past 17 months has caused him anguish of a sort that few defendants charged with white collar crimes have endured. In adopting Mr. Lee's recommendation of a total incarcerative sentence of additional time beyond that which he has already served results in a justifiable conclusion that the sentence is "just punishment." Adding a likely large restitution to alleged "victim" banks, given his lack of assets and limited future earning capacity will loom over his life for multiple decades if not the rest of his life.

Mr. Lee and his family have lived continuously in Ireland since early 2006. Although Mr. Lee and his two daughters are American citizens and lived in Massachusetts for a while, the family returned to Ireland once the children were school-aged to give them an Irish education and a different quality of life. The girls were young when they moved to Ireland and have little memory of their life in the United States. They are thoroughly Irish. Both Mr. Lee and his wife, Lydia, were born and raised in Ireland and their return enabled them to spend more time with his aging parents. Because of Mr. Lee's detention his wife, daughters, and parents have not been able to visit him over the last 15 months. His sole contact has been through letters and expensive phone calls from jail. He has now spent birthdays, two Christmases, and other holidays alone without any family. It is taking a toll on his mental health.

While Mr. Lee's situation may not be unlike a number of other federal detainees, it differs in the respect that Mr. Lee can no longer take care of his disabled wife. Worse still is that his absence has forced his wife to fend for herself financially and medically, an almost

impossible feat for her in her condition.  She has gone from 100% dependence on Mr. Lee for all

her and her childrens needs to taking on all those responsibilities herself.  The effect on her has

taken a toll on her health and emotional well-being.

> **(c) Protecting the Public from Mr. Lee Will Be Accomplished by Imposing the Proposed Sentence.**

Mr. Lee's sentence request will protect the public.  The offense conduct outlined in the

Indictment occurred between 2005 and early 2006, 14 years ago.  Mr. Lee moved to Ireland in

March 2006 and has not been convicted of any crimes either in the United States or Ireland other

than the Indictment in this case.  Other than the instant case, Mr. Lee has demonstrated that he is

a law-abiding person and given the fact that he has not engaged in illegal behavior for a decade

and a half, it is highly unlikely that he will re-offend in the future.  Thus, a sentence of 41

months serves to protect the public and a longer sentence is merely punitive without any residual

protection of the public.

Another way to measure whether the proposed sentence will protect the public is to look

at Mr. Lee's actions during the extradition proceedings.  Extradition proceedings were

commenced in the Irish courts by the U.S. Attorney's Office sometime in 2012.  He posted bail

and was released on the condition that he report to the local Irish police department twice daily.

He never once failed to check-in with the police during the 5 years that the extradition

proceedings were pending and attended all court hearings in Ireland.  A Letter from the Irish

Court confirms that Mr. Lee has been in full compliance with his bail terms throughout the

extradition hearings. See Exhibit 8.

It is rare for this Court to have such an extensive record to consult in making a

determination of a just sentence.  However, Mr. Lee has unequivocally demonstrated his

commitment to comply with all requirements imposed on him on a daily basis for a sustained

period of time.  It was extraordinary by any means of measurement and especially because during that period of time his wife has been dealing with her injuries.  Mr. Lee left the hospital where he monitored his wife's condition to check in with the local police on a daily basis.  While she was recovering at home following her hospitalization, he left her to sign the log-in book at the local police station.  Not once did he ask the Irish court to loosen its restrictions to permit him to check in with the local police on a less frequent basis.  He made a commitment to the court and he kept it throughout turmoil in his personal life. The fact that for all those years during the pendency of the extradition proceedings, Mr. Lee honored his bail conditions is solid evidence that the public will be protected from him.

The ongoing health problems by Mr. Lee's wife and her inability to care for herself or her daughters without Mr. Lee's assistance have made Mr. Lee a profoundly different person today than he was in 2005 and 2006 when the offense conduct occurred. Lydia's car accident creates a greater incentive on Mr. Lee to ensure his availability to care for his disabled wife.  The hardship the entire Lee family has endured as a result of his detention is certainly something Mr. Lee does not want to repeat. The deep effect on him of his detention in the United States and absence from the family in Ireland is a strong deterrent especially in light of the life-altering trauma faced by the entire family as a result of Lydia's accident.

### (d) The Nature and Circumstances of the Offense Justify a Below Guidelines Sentence.

Mr. Lee pled guilty to one count of wire fraud under 18 U.S.C. § 1343 (Count 4 in the Indictment) and one count of an unlawful money transaction under 18 U.S.C. § 1957 (Count 34 in the Indictment) relating to the purchase and sale of residential property in the Boston area. The remaining counts in the Indictment against Mr. Lee (counts 1-30, 5-33, 35-55) will be dismissed following imposition of sentence in accordance with the November 1, 2018 plea

agreement.[6]  Count 4 related to the sale of 110 Norton St. in Dorchester on April 27, 2006 for $448,337.  Count 34 related to units 1 and 2 of 110 Norton Street, the closing of which took place on June 6, 2006.  It is important to note that the Indictment shows that the proceeds of the sale were paid to Dwight Jenkins' wife and not to Mr. Lee.

In broad terms, the allegations forming the basis of the Indictment were that Dwight Jenkins, Eric Archambault, Patrick Lee, John Nelson, and "straw" buyers were involved in the purchase and sale of triple deckers in South Boston and Dorchester that were converted subsequently to condominiums.  Mr. Lee and family members owned the triple deckers, all of which were bought and sold between July 2005 and May 2007 (See ¶ 18 of the Indictment).

The well-known and frequently analyzed cataclysmic economic depression of 2008 caused real estate values to sharply plummet in Massachusetts and throughout the nation. Just prior to the transactions in the Norton Street property, real estate values in Massachusetts were skyrocketing.  Banks, like the ones in this case, had loose lending policies and practices enabling them to take advantage of the seemingly endless escalation of property values. Those practices led to the demise of many financial institutions in Massachusetts and throughout the country. One such bank that did not survive was Union Capital Mortgage Business Trust (the "Bank"), the lender on 110 Norton Street.  It was terminated in 2010 as a result of a Consent Order with the Massachusetts Division of Banks upon allegations of significant failures in complying with applicable state and federal laws governing the conduct of those engaged in the business of a mortgage lender and mortgage broker in Massachusetts.[7] The Bank's loan on 110 Norton Street was most likely largely immaterial to the Bank's downfall. As Judge Stearns commented in a civil lawsuit (against Dwight Jenkins, one of the main wrongdoers here) "[f]or their part, the

---

[6] Counts 11-14 relate to John Nelson, Mr. Lee's co-defendant.  Mr. Nelson was also charged in all other counts in the Indictment as Mr. Lee. He was acquitted after trial on all counts.

[7] A copy of the Consent Order with the Massachusetts Division of Banks as to Union Capital Mortgage Business Trust dated June 3, 2010  and the Consent Order With George Fabrizio the mortgage loan originator for UCMBT are attached as Exhibit 9.

lenders (like Fremont) turned a blind eye to the transactions knowing that because of rapid securitization in a lazily regulated market, they were taking on almost none of the risk of the inevitable defaults." See *Smith v. Jenkins,* 818 F. Supp. 2d, 336 footnote 7 (D. Mass. 2011).

The Bank was willfully blind in its lending policies and practices. Their singular focus of making significant fees from their mortgage lending and quick sale of those mortgages to Fannie Mae was the likely impetus for their behavior. They deserve a large share of the blame for the economic collapse in 2008 and calling them "victims" is a misnomer of grand proportion. As we now know, few of those banks were criminally charged or otherwise held responsible for their recklessness. We point this out not to excuse Mr. Lee's actions but to contextualize them.

> **(i)     The Government Unwisely Chose Dwight Jenkins (the Recruiter of the Straw Buyers) to Provide Assistance in the Mortgage Fraud.**

In 2009, Dwight Jenkins ("Jenkins") was convicted in a companion Indictment (Case No. 09-10373) and testified in the government's case in chief against John Nelson in 2012.[8]  He began cooperating with the government one month after his Indictment and many years before Mr. Lee was charged. The government chose to rely on Jenkins despite his primary role in the mortgage fraud, established criminal history for fraud, and in-your-face probation violations. Some of Jenkins' testimony at Nelson's trial underscores his lawlessness:

- He used multiple aliases and false identities. p. 15;
- He used fake social security numbers and dates of birth. p. 16;
- He never filed tax returns. p. 20;
- He was convicted of bank fraud in 2001 for the sale of counterfeit checks. p. 16;
- In 2003 and 2004 he committed fraud by recruiting straw buyers for a realtor, John Adamos. p. 56;
- Violated his probation after serving one year in jail. p. 21;

---

[8] Jenkins' role in the fraud was to find buyers for the properties and interface with Eric Archambault. ("Q: What was Dwight Jenkins' role? **A.** Dwight Jenkins' role was to find the buyers for these condo conversions to buy the properties."). p.17 of Archambault testimony at Nelson's trial. ("**Q.** And what did you understand Dwight Jenkins did? **A.** He was finding people for first-time home buyers."). See p. 85 of Archambault's testimony at Nelson's trial. In addition, Jenkins had a team of sub-recruiters who were paid to find buyers for the condo units. See Dwight Jenkins trial transcript pp. 4 and 5.

- In a civil suit against him for fraud he submitted a false affidavit under oath. p. 55;
- He recruited straw buyers with the pitch in the 2006 mortgage fraud plan that he would take care of everything…all the straw buyers had to do was sign the closing papers." p. 57.  He lied;
- He hired a number of recruiters to locate straw buyers. p. 57-68;
- He hired friends to be "fake verifiers" of the employment of the straw buyers to the banks. P.69;
- In 2006 he was not legally permitted to have a bank account in his name because of his conviction for passing counterfeit checks. p. 53;
- To avoid detection, he used his girlfriend's identity to set up Lauren Boardman Real Estate in 2006 to funnel money meant for him in the mortgage fraud schemes. p. 31;
- To avoid detection of his probation violation, he opened bank accounts in the names of his wife, sister, and girlfriend. p. 54;
- Shortly after meeting Eric Archambault in 2006, Jenkins started "exchanging money outside the closings. p. 47;
- He gambled between $3,000 and $6,000 per week at Foxwoods in 2006 in violation of his probation. p. 86;
- He continued to gamble 3-4 times per week at Foxwood's while on probation for his '09 case. p. 87;
- He didn't declare any of the winnings he made gambling to the IRS. p. 88;
- He also continued to do drugs while he was on probation in the '09 case. p. 88;
- In 2006 he drank over a pint of alcohol per day and did cocaine regularly. p. 19.  It was a probation violation;
- He never told his wife about his affair with Laura Boardman. p. 90;
- He never told Laura Boardman he was married. P. 90;
- He personally profited over several million dollars; p. 82; and
- He testified that the sole judges of his truthfulness is Sandra Bower and Christine Wichers. p. 95.

By admitting that the government was the *sole* judge of his truthfulness, Jenkins proved that Judge Tauro and the jury were not his audience. All he had to do was convince the government his testimony was truthful.  His strategy clearly backfired. Judge Tauro's acquittal of Nelson following Jenkins' testimony, although not specified, could only have been a result of Jenkins' testimony.  His extensive documented history of fraud dating well before he met Mr. Lee and his flagrant, unabated probation violations demonstrate his word is not his bond.  One

more thing about Jenkins; he was convicted recently of driving with a suspended license in Brockton District Court.  His lawlessness continues and his credibility remains nil.

### (ii)     Eric Archambault (the Mortgage Broker) Was Jenkins' SideKick Who Also Got an Undeserved Great Deal from the Government.

Eric Archambault ("Archambault") was convicted in the same Indictment as Jenkins (case number 09-10373) for 16 counts of wire fraud in the purchase and sale of residential properties in the greater Boston area and 2 counts of money laundering relating to many of the same properties in the Lee/Nelson Indictment. He was an experienced mortgage broker who served as the conduit and facilitator between the banks and buyers by submitting mortgage loan applications.[9] ("Q.  Now, I believe you agree that when you're a mortgage broker, you're the conduit between the borrower and the bank; correct? **A.** Yes."). See p. 119 of Archambault's testimony at Nelson's trial.   See also Jenkins trial testimony at p. 6 ("Q: What was Eric Archambault's role? A: Mortgage broker…." "Q: What did he do? A: He processed loan applications." See pp. 7 and 8).

Archambault testified that he got the false information for the loan applications from Jenkins and his recruiters:

**Q.** With respect to these specific properties, what did you
do with respect to getting the loans?
**A.** Um, I turned around and was the mortgage broker that did
the, got the financing for them. For the borrowers.
**Q.** How did you -- what, if any, information did you get
about the borrowers?
**A.** Um, there was a couple of borrowers on that turnaround
and sent over their information through a phone call or
through a third party that would turn around and say, you
know, here's my date of birth, my Social Security number and
my work history and obviously their name.
**Q.** How else would you get information about them?
**A.** Um, sometimes I could, Lenny Howze would turn around and

---

[9] Archambault testified at Nelson's trial that he was a mortgage broker since 2002 first for Aegis Mortgage and then for Grant Mortgage before forming his own company, Old American Mortgage, in 2004.

give me their information and send it over.
**Q.** Who is Lenny Howze?
**A.** Lenny Howze worked with Dwight Jenkins.

pp. 19-20 of Archambault's testimony at Nelson's trial.

Archambault submitted the false information to the bank on 110 Norton Street, the property to which Mr. Lee pled guilty.  ("**Q.** So with respect to Tommy Clark who bought two units in 110 Norton Street, I believe you testified on direct that you filled out or provided the information on both of his mortgage loan applications? **A.** Correct. **Q.** Is that right? **A.** Yes."… **Q.** Tommy Clark never told you to put that lie down; did he? **A.** No, he did not. See p.105-107 of Archambault's testimony at Nelson's trial.

Archambault knew Lee to be a legitimate developer: "**Q.** And you previously knew Pat Lee for a number of years; right? **A.** Correct. **Q.** You knew him to be a legitimate developer? **A.** Yes." See p. 85 of Archambault's testimony at Nelson's trial.

### (iii)    Archambault Spent One Day in Prison.

Despite the fact that Archambault used his experience as a mortgage broker to knowingly submit numerous false loan applications to the banks, he was sentenced to "time served." Since Archambault was not detained at any stage from his arrest to his sentencing, a time served sentence meant that he did not serve a day in prison.  The rather unusual rationale by Judge O'Toole for its judgment was that the length of time the case was pending (two years) had a "punitive impact" on him.[10]  See Exhibit 10.

The Order Setting Conditions of Release required only monthly reporting to Pre-trial Services in addition to the standard conditions, hardly an onerous burden. Nonetheless, Archambault petitioned the court twice in those two years to amend his conditions of release permitting him to travel outside New England with his family for vacation.  See Exhibit 11. He

---

[10] The punitive impact on Lee has been much greater than it was on Archambault.

was also successful in modifying his conditions of release several more times to travel outside New England for several days at a time for work training. *Id.* Viewing the benefits he was granted, it is unclear what the punitive impact was on him in those two years, the court failing to point to anything specific or anything outside the normal impact on a white-collar defendant. Taking two family vacations in two years, travelling out of New England multiple times for work seminars, and reporting monthly to PTS are things Mr. Lee would have willingly done.

Archambault's advisory guideline sentence was 37-46 months. Even though he cooperated with the government and a 5K.1 motion was filed, the government still sought a sentence of incarceration. Clearly, the sentencing court did not accept the government's recommendation enabling the defendant to leave court with his family the day of his sentencing the same way he did two years earlier following his arrest. Given his material role in the fraud scheme, his lack of serving even one day in prison was extraordinary even when viewed through the lens of cooperation.

### (iv)     Jenkins and Archambault's Deep Business Ties.

It is indisputable that Archambault had a close collaborative business relationship with Jenkins beyond the fraud scheme to which they both pled guilty. He testified at the trial of John Nelson that in October 2006 he and Jenkins formed E&D Corp to build and sell houses in Alabama. See p. 86 of Archambault's testimony at Nelson's trial. In May 2007 Archamabult testified that he invested in Jenkins' business called Deal Structure whose goal was to buy and sell houses. See p. 88 of Archambault's testimony at Nelson's trial. In that same time period Archambault "loaned" Jenkins $75,000.00 for a "casino." See p. 87 of Archambault's testimony at Nelson's trial. Two emails from Jenkins to Archambault entered into evidence at Nelson's trial demonstrate poetically the co-dependency of the Jenkins/Archambault relationship: Jenkins to

Archambault-"Did you get my emails, money man?" See p. 89 of Archambault's testimony at Nelson's trial.   And the other one: "Here for you, man, let's move now." See p. 90 of Archambault's testimony at Nelson's trial.   There is no evidence that Lee was included in the Jenkins/Archambault business ventures.

<div align="center">(v)   <strong>Lee Was in Ireland When Jenkins and Archambault Were Indicted.</strong></div>

Mr. Lee and his family moved permanently to Ireland in the spring of 2007 and the government has previously acknowledged that there was no grand jury or other investigation about which Mr. Lee would have been aware at the time of the family's move. Mr. Lee did not flee from an investigation or charges against him. Two years later in 2009 Jenkins and Archambault were arrested and charged with mortgage fraud.   They both cooperated one month after their arrest implicating Mr. Lee in the mortgage fraud.   An extradition warrant in Ireland was not sought by the government until May 2012.

Because Mr. Lee lived outside the United States when Jenkins and Archambault provided cooperation in 2009, it was not a big risk for them to pin the blame on him.   He was the proverbial defenseless empty seat at the table.   They could exaggerate his role in the mortgage fraud and the likelihood of detection was low. On the other hand, Lee was not given a realistic opportunity by the government to provide substantial assistance against them given his absence. Instead the government chose to seek Lee's extradition long after the ink on Jenkins and Archambault's cooperation agreement dried. The net result is that the most culpable members of the fraud got the most lenient sentences.   This Court should right the ship.

<div align="center"><strong>(vi)   Brian T. O'Donnell (the appraiser).</strong></div>

In the Plea Agreement, the government will dismiss the aggravated identity charge following sentencing of Mr. Lee.   The Indictment alleges that Mr. Lee either prepared appraisals using

<div align="center">17</div>

Brian T. O'Donnell's signature or assisted in the preparation of the appraisals (Lee "prepared residential real estate appraisals in support of mortgage loan applications, but made the appraisals appear as though they had been prepared by B.T.O." See ¶ 21 of the Indictment.) [11]. It is our position that the government agreed to dismiss that charge because of the lack of evidence on the subject.  The exclusive evidence on the appraisal issue would have been from O'Donnell and he died in January 2017.  There is no forensic evidence from O'Donnell's computer showing that Mr. Lee prepared or assisted in the preparation of any of the appraisals and there was no witness who would have testified that Mr. Lee prepared the appraisals.  Nor has the government conducted fingerprint or other scientific analysis to show that Lee used O'Donnell's digital signature.

Only O'Donnell possesses the answer to the ultimate questions of whether (1) he or Lee prepared the appraisals, or (2) authorized Lee to sign his name on the appraisals. The appraisals themselves do not answer those questions. Because Mr. O'Donnell died several years ago, he obviously cannot weigh in on this issue. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." Mr. Lee did not have the right to confront O'Donnell before he passed away.

With respect to count 4 of the Indictment to which Mr. Lee pled guilty the government's similar position is that Mr. Lee prepared the March 30, 2006 appraisal for 110 Norton Street under the signature of licensed appraiser Brian T. O'Donnell ("O"Donnell") and did not disclose Mr. Lee's supposed participation in preparing the report. The appraisal contained a conflict-of-interest disclaimer averring that the person preparing the report had no interest in the property

---

[11] There are no allegations by the government that the values of the appraisals were too high or inconsistent with market values.  In addition, the appraisals contain a comparison with properties in the same geographic area to support its ultimate value.

and no interest or bias with respect to either the buyer or the seller. Of course, if O'Donnell prepared the appraisal there was no conflict of interest.

In support of its position, the government asserts that Mr. Lee's company, Northeast Value Consultant, billed the Bank for the appraisal and was paid for it. The government ignores the fact that that Mr. Lee's Company, Northeast Value Consultants, paid O'Donnell for that appraisal. See Exhibit 12.  Payment to O'Donnell seriously undercuts the government's position that he did not prepare the appraisal or that Mr. Lee forged O'Donnell's signature.

Further, it is unlikely whether the conflict-of-interest disclaimer in the back of the appraisal form would have been a material basis in 2006 on which the Bank would deny a borrower's loan application.  Banks were granting mortgages haphazardly at that time. Given the Consent Order that the Bank "significantly failed in complying with applicable state and federal laws, rules, and regulations" it most likely would have approved the loan on 110 Norton St. regardless of a potential conflict of interest.  Approval of mortgage loan applications by the banks in the heady real estate days of 2006-2007, in all realistic probability, did not hinge on whether O'Donnell or Lee prepared the appraisals.

### (vii)   95 Topliff Street.

The only count in the Indictment that did not directly relate to Jenkins is 95 Topliff Street.  The closings took place in 2007 while Mr. Lee had already returned to Ireland. The buyer was Roje Bent.  His employer was Ralph Appolon and he paid Bent to buy the property on his behalf.[12]  Bent, who testified at Nelson's trial, named all those in attendance at the closing and did not identify Mr. Lee by name or physical description.  See Days 6 and 7 of Nelson trial transcript.  Nor did Bent testify that he had any contact with anyone other than Ralph Appolon concerning the transaction.  Appolon was not interviewed by the FBI and there are no 302

---

[12] We point out that there was no appraisal on 95 Topliff Street produced by the government.

Reports on his purported testimony against Mr. Lee.  However, Appolon and Jenkins recruited from the same inner-city, low income community and tapped the same network of financially inexperienced members of the community to "invest" in real estate.  Both Appolon and Jenkins were convicted of mortgage fraud in separate indictments.  The two are demonstrably not credible and it is probable that Appolon and Jenkins engineered 95 Topliff Street together while Lee was living in Ireland.

### Conclusion.

For all the reasons set forth above, in the attached exhibits, the video of Lydia Lee, Mr. Lee's expected address to this Court at the sentencing hearing, and oral argument, we request that this Court exercise its authority to sentence Mr. Lee to a term of incarceration of no more than 41 months and 3 years of supervised release which he be permitted to serve in Ireland on the compassionate  ground that this sentence is sufficient but no longer than necessary to serve the statutory purposes of punishment as articulated in 18 U.S.C. § 3553.

<div style="margin-left: 40%;">
Patrick Lee<br>
By his attorney,<br>
<i>/s/ Valerie S. Carter</i><br>
Valerie S. Carter, BBO No. 545412<br>
CARTER & DOYLE LLP<br>
110 Cedar Street, Suite 250<br>
Wellesley Hills, MA 02481<br>
781.235.4400<br>
vcarter@carterdoyle.com
</div>

DATED: February 14, 2019